UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                          :
DAVID EVDOKIMOW,                          :
                                          :
        Petitioner,                       :    Civ. No. 19-14130 (NLH)
                                          :
    v.                                    :    OPINION
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
        Respondent.                       :
_____:

APPEARANCES:

Lawrence S. Lustberg, Esq.
Jason R. Halpin, Esq.
Gibbons, PC
One Gateway Center
Newark, NJ 07102-5310

        *Attorneys for Petitioner*

Philip R. Sellinger, United States Attorney
Vera Varshavsky, Assistant United States Attorney
Office of the U.S. Attorney
970 Broad Street
7th Floor
Newark, NJ 07102

        *Attorneys for Respondent*

HILLMAN, District Judge

    David Evdokimow ("Petitioner") moves to vacate, correct, or set aside his federal sentence pursuant to 28 U.S.C. § 2255. ECF No. 1; United States v. Evdokimow, No. 14-cr-0605 (D.N.J.)

("Crim. Case").  Respondent United States opposes the motion.

ECF No. 14.  For the reasons that follow, the Court will deny

the § 2255 motion.  No certificate of appealability shall issue.

I.  <u>BACKGROUND</u>

The Court adopts and reproduces the facts of this case as

set forth by the United States Court of Appeals for the Third

Circuit in its opinion affirming Petitioner's convictions:

> Defendant David Evdokimow was a plastic surgeon who
> operated his own practice, De'Omilia Plastic Surgery
> ("De'Omilia") in northern New Jersey.  Starting in 2006,
> Evdokimow hired two individuals, John Wright and Ginger
> Sweeton, to help him make financial arrangements to
> reduce his taxes.  Although Evdokimow's prior accountant
> warned him not to get involved with Wright and Sweeton,
> he retained them anyway.
>
> Wright, Sweeton, and Evdokimow put in place a scheme in
> which Evdokimow arranged for the creation of a series of
> shell corporations to which he transferred proceeds from
> his practice.  Evdokimow then used those funds to pay
> his personal expenses.  The shell corporations were
> created with the assistance of Evdokimow's friends and
> employees, who were listed as the corporations'
> directors and officers and also opened bank accounts in
> the names of the corporations at Evdokimow's request.
> Evdokimow also had these associates create signature
> stamps, which he then used to write checks from the shell
> corporations' bank accounts and to file tax returns for
> the corporations.  Evdokimow kept the signature stamps
> in the basement of the house where his parents lived,
> rather than in his office or his own home.  Once
> Evdokimow transferred money from his practice to the
> corporations, he claimed those transfers as business
> expenses on both his personal tax returns and the
> business tax returns for De'Omilia, thereby reducing his
> and his practice's taxable income.  Evdokimow also paid
> part of his employees' salaries through checks
> purportedly written as bonuses or for reimbursement of
> expenses from which no taxes had been withheld.  He also
> had his patients make checks out to him personally and

would cash those checks at banks where either he or a trust in his name had accounts. Evdokimow avoided cashing $10,000.00 or more in checks at any one time to avoid his banks' currency reporting requirements, and did not report that income on his tax returns.

Evdokimow and Sweeton regularly discussed the tax scheme, and Sweeton provided instructions to Evdokimow that explained not only the mechanics of the arrangements, but also that their purpose was to "swap [ ] money to keep it from being taxable to" him. Evdokimow also discussed the tax scheme on multiple occasions with Dr. Augusto DaSilva, who had a similar arrangement with Wright and Sweeton. Evdokimow and DaSilva occasionally used code phrases to discuss Wright and Sweeton. On at least one occasion, an employee with knowledge of the arrangements warned Evdokimow that he risked getting caught if he did not pay more taxes.

In 2008, the Internal Revenue Service ("IRS") audited Evdokimow's 2006 personal tax return. In his response to the audit, Evdokimow made false statements to the IRS agent to support representations in his return. Sweeton also told Evdokimow that she would create documents to substantiate the deductions he had claimed in his returns. Sweeton then created and provided to the IRS false documents that included fake mileage logs to reflect nonexistent business trips and false invoices from the shell corporations to De'Omilia. Based on these materials, the IRS agent found that Evdokimow owed approximately $122,000 in taxes and penalties, which Evdokimow paid. In the wake of the audit, DaSilva, who had also been audited, considered firing Sweeton, at which point Evdokimow told DaSilva that "we know that what we're involved with is bullshit" and "if you're going to the IRS, you're going to go to jail. . . . You have no choice but to continue."

The effect of the scheme was to substantially reduce Evdokimow's tax payments. Between 2006 and 2010, Evdokimow failed to report over $5.95 million in income on his personal tax returns, which resulted in $935,476.00 in unpaid taxes. De'Omilia failed to report over $5.83 million in income over the same period, which resulted in a tax deficiency of more than $2 million.

3

<u>United States v. Evdokimow</u>, 726 F. App'x 889, 891-92 (3d Cir. 2018).

On the recommendation of a friend, Petitioner hired James A. Kridel, Jr. of the Kridel Law Group in 2012 after Petitioner received a subpoena.  Tr. Feb. 24, 2021, 889:6-12.  Kridel received his Juris Doctorate from Rutgers University School of Law in approximately 1974 and received his LLM in Taxation from New York University.  Declaration of James Kridel ("Kridel Dec.") ECF No. 14-1 ¶ 2.  Several attorneys from Kridel's office also worked on Petitioner's case, including Geoffrey Orlandi, Esq., Evelyn Nissirios, Esq., Eunjin E. Lee, Esq., and Anne Heldman, Esq.  <u>Id.</u> ¶ 7.

Kridel recommended that Petitioner hire Abdin Aly, an accountant whose office was in the same building as Kridel's office, to prepare amended returns for the years in question.  Tr. Oct. 22, 2020, 29:7-16.  Petitioner also retained Lawrence S. Feld, Esq., a former federal prosecutor from the United States Attorney's Office for the Southern District of New York and criminal tax fraud expert, <u>id.</u> 18:1-4, as well as William Morrison, a CPA and forensic accountant.

Petitioner's amended returns were not submitted until June 2013 due to Aly's delays in preparing the returns.  The United States filed a motion in limine to preclude Petitioner from presenting evidence that he filed amended tax returns and paid

4

additional taxes after learning of the criminal investigation. Petitioner and Kridel had expected Feld to argue the motion, but Feld declined to do so and told Petitioner and Kridel in the car on the way to the motion argument. Id. 20:13-23. Kridel opposed the motion in court, but this Court ultimately granted the Government's motion and concluded that the subsequent payment of taxes did not shed enough light on Petitioner's state of mind at the time he filed his original returns. Crim. Case No. 36 at 41. The Court noted the 18-month delay in amending the returns in making its decision. Id. at 42. Petitioner fired Feld shortly thereafter. Tr. Oct. 22, 2020, 19:10-20.[1]

After Feld's departure and shortly before trial commenced, Robert Basil, Esq. joined Petitioner's defense team. Basil graduated from Rutgers Camden Law School and was admitted to the bar in 1988. He later obtained an LLM in corporate law from New York University School of Law and a Master of Business Administration from Fordham Graduate School of Business. Tr. Dec. 9, 2020, 342:20-25.

Jury selection commenced on October 16, 2015. Crim. Case No. 38. Kridel moved for reconsideration of the Court's exclusion order, which the Court denied. Crim. Case No. 42, 46.

---

[1] Kridel later assisted Petitioner in filing a fee arbitration case against Feld, which was ultimately successful, ECF No. 1-21.

Trial lasted twelve days; on November 18, 2015, the jury convicted Petitioner on all counts.  Crim. Case No. 84.  The Court sentenced Petitioner to a total term of 36 months imprisonment to be followed by a one-year term of supervised release and a total fine of $96,000.  Crim. Case No. 109.[2]

Petitioner filed a timely appeal with the Third Circuit.  Evdokimow, 726 F. App'x 889.  He argued that this Court abused its discretion in excluding evidence that he amended his tax returns and that the prosecutor made improper comments during summation implying that Petitioner had not paid his taxes.  Id.  The panel affirmed the convictions 2-1.  Id.

On June 21, 2019, Petitioner filed his motion to correct, vacate, or set aside his federal convictions and sentence.  ECF No. 1.  The United States submitted its answer on February 10, 2020.  ECF No. 14.

On March 13, 2020, the President of the United States declared a National Emergency in response to the coronavirus (COVID-19) pandemic.  Under the authority of Chief Judge Wolfson's Standing Orders and with the consent and cooperation

---

[2] Although Petitioner has completed his custodial term of imprisonment, his motion under § 2255 is not moot because of continuing collateral consequences.  See Spencer v. Kemna, 523 U.S. 1, 8 (1998).

of the parties,[3] the Court conducted a series of evidentiary hearings using a video-conferencing platform on October 22 and 28, 2020; December 9, 2020; February 3, 11, 17, and 24, 2021; March 4, 17, and 23, 2021; and April 6, 2021.

II.   STANDARD OF REVIEW

Section 2255 provides in relevant part that

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Under Strickland v. Washington, a claim of ineffective assistance of counsel requires a petitioner to show that (1) defense counsel's performance was deficient and (2) the deficiency actually prejudiced the petitioner.  466 U.S. 668, 687 (1984).  The first Strickland prong is satisfied if defense counsel made errors that were serious enough such that counsel was not functioning as the "counsel" the Sixth Amendment guarantees.  Id.  This is a high standard, especially given the strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689;

---

[3] The Court expresses its appreciation to counsel on both sides for their advocacy and cooperation and for conducting this matter with professionalism and distinction in the difficult circumstances presented.

United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989).  A
court must be "highly deferential" to a defense counsel's
decisions and should not "second-guess counsel's assistance
after conviction."  Strickland, 466 U.S. at 689; Berryman v.
Morton, 100 F.3d 1089, 1094 (3d Cir. 1996).

For the second Strickland prong, Petitioner must show "a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different.
A reasonable probability is a probability sufficient to
undermine confidence in the outcome."  Strickland, 466 U.S. at
694.  "The likelihood of a different result must be substantial,
not just conceivable."  Harrington v. Richter, 562 U.S. 86, 112
(2011).

"[T]here is no reason for a court deciding an ineffective
assistance claim to approach the inquiry in the same order or
even to address both components of the inquiry if the defendant
makes an insufficient showing on one."  Strickland, 466 U.S. at
697.  "If it is easier to dispose of an ineffectiveness claim on
the ground of lack of sufficient prejudice, which we expect will
often be so, that course should be followed."  Id.  See also
United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002)
("Because failure to satisfy either prong defeats an ineffective
assistance claim, and because it is preferable to avoid passing

judgment on counsel's performance when possible, we begin with
the prejudice prong.").

III. <u>DISCUSSION</u>

Petitioner raises several ineffective assistance of counsel
arguments: (1) Kridel failed to ensure that Petitioner's tax
returns were promptly corrected; (2) Kridel failed to conduct an
adequate pretrial investigation; (3) Kridel failed to adequately
prepare for trial; (4) Kridel breached the attorney-client
privilege in conversations with the Government; (5) Kridel did
not adequately cross-examine the Government's witnesses; (6)
Kridel was abusing alcohol during the trial, was drunk during
trial, and sometimes fell asleep during trial; (7) Kridel
delivered an inadequate closing statement; and (8) Kridel's
cumulative errors constituted ineffective assistance.

A.   <u>Correction of Petitioner's Tax Returns</u>

Petitioner alleges that "Kridel's failure to act to protect
Evdokimow's interests, Evdokimow's amended tax returns were
filed late; the first of Evdokimow's amended returns was not
filed until June 2013." ECF No. 1 ¶ 6. "This delay had a
crushing impact on Evdokimow's defense at trial, as Evdokimow
was, as set forth above, barred from introducing evidence that
he had amended his returns based entirely upon the delay between
the time Evdokimow learned of the government's investigation and
the time his amended returns were filed, which this Court held

to be too long to be considered 'prompt;' the Third Circuit affirmed the conviction on that basis." Id.; see also Evdokimow, 726 F. App'x at 894-97.

The Court heard testimony and argument on this claim as part of the evidentiary hearing. After considering the evidence and arguments of the parties, the Court concludes Petitioner has failed to satisfy Strickland's prejudice prong.

The United States moved to exclude any testimony or evidence that Petitioner amended his tax returns and paid the outstanding amount after he learned of the investigation. For his part, Petitioner sought to introduce them as part of his defense that he relied on Sweeton in good faith. At the September 9, 2015 motion in limine argument, the Court expressed its primary concern with admitting this evidence:

> The fact that he later paid his taxes could be so potentially confusing to the jury and runs too high a risk of jury nullification, . . . potentially uncurable in my mind by even a careful instruction as to render it admissible. It would simply be every criminal defendant's option in a tax case to figure out what I should have paid a long time ago and pay it and just argue to the jury that I pay my taxes like anybody else. The issue here is [Petitioner's] mental state at the time, and he may present evidence of that short of any subsequent payment of taxes he later determined were owed.

Crim. Case No. 36, 42:24 to 43:9. It acknowledged that there may be probative value to the evidence, but that value was marginal in light of the extensive delay between the original

returns and corrected returns.  Id. 41:3-25 (citing United
States v. Stoehr, 196 F.3d 276 (3d Cir. 1952)).

        The Court finds that there is not a reasonable probability
that a prompt correction of Petitioner's returns would have
altered the Court's decision.  Stoehr does not require a trial
court to admit evidence of a defendant's subsequent statements
and conduct; it acknowledges that evidence is subject to the
same individualized consideration of relevancy and prejudice
that governs all evidence.  See also Fed. R. Evid. 403;
Evdokimow, 726 F. App'x at 902 (Cowen, J., dissenting) ("While
obviously predating Rule 403 itself, [Stoehr] appears to
anticipate the rule's basic approach to admissibility.").

        The trial court's "inquiry in each instance must be: Is the
evidence of the defendant's subsequent mental state (which
evidence is supplied by the subsequent act) of any probative
value in establishing his state of mind at the time of the
alleged criminal acts, and if so, does the evidence not unduly
entangle the issues or confuse the jury?"  Stoehr, 196 F.2d at
282.

        The Court's primary concern with the proffered evidence was
that it did not shed enough light, or in this case when viewed
with the other evidence of record any real light at all, on
Petitioner's state of mind at the time he filed his original
returns.  The delay in filing the amended returns, which

included having to reconstruct grossly doctored books by accountants unfamiliar with Petitioners practices, reduced the probative value, but even a prompt correction of Petitioner's tax returns would have had a "slight probative value" at best. Crim. Case No. 36, 42:2-8.  The "slight probative value" of more timely filings still would have been substantially outweighed by the potential for prejudice and confusion to the jury.

Kridel's testimony regarding the mock trial underscores the Court's concerns: "The jury was very interesting.  The jury felt that – I'm trying to remember exactly what was said, but they said something about, well, if he paid his taxes, we wouldn't be here."  Tr. Oct. 22, 2020, 122:22-25.  The mock jury's fixation on Petitioner's subsequent payment of taxes shows the likelihood that the empaneled jury would have been misled or distracted from the actual issue in the case: Petitioner's state of mind at the time he filed the false returns.

Accordingly, the Court concludes that there is not a reasonable possibility the Court would have ruled differently on the motion in limine even if the corrected returns had been filed in a more expeditious manner.  The Court will deny relief on this claim.

B.   Inadequate Pretrial Investigation

Petitioner further argues Kridel failed to conduct an adequate pretrial investigation.  Specifically, he asserts that

Kridel failed to interview former accountant James Apostle, failed to investigate government witnesses, and failed to investigate character witnesses.

Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.  "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." United States v. Travillion, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); see also United States v Gray, 878 F.2d 702, 711 (3d Cir. 1989); United States v. Baynes, 622 F.2d 66, 69 (3d Cir. 1980).

   1.   James Apostle

Petitioner argues it was ineffective assistance for Kridel not to interview Petitioner's former accountant, James Apostle, before Apostle's death in May 2013.  Petitioner asserts that "Apostle's testimony would have revealed that Sweeton built a passable façade of propriety to hide her fraud, thereby keeping Evdokimow in the dark until he learned of the government's

13

investigation." ECF No. 1 at 5. Petitioner testified during the evidentiary hearing that Apostle reviewed Sweeton and Wright's proposal for creating new corporations and concluded it was "complex but doable."[4] Tr. Feb. 24, 2021, 927:1; see also ECF No. 57-17. Petitioner further testified that he informed Kridel of Apostle's statement and that Kridel indicated he would reach out to Apostle. Tr. Feb. 24, 2021, 928:1-15. Petitioner denied that Kridel ever suggested that Apostle would be a bad witness and claims he believed Kridel was going to hire an investigator to interview Apostle. Id. 930:5-15.

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689

---

[4] Petitioner's certification stated that Apostle told him the corporate structure was "seemed complex, but sound." Certification of David Evdokimow ("Evdokimow Cert."), ECF No. 1-21 ¶ 14. He testified that he used "sound" and "doable" interchangeably. Tr. Feb. 24, 2021, 927:8-13. Even if Petitioner's testimony about what Apostle said were credible it is of limited utility. It suggests that Apostle would have, as Petitioner does, conflate the use of LLCs as related entities to a medical practice (or any business for that matter) for legitimate purposes – for example to own real estate or equipment – and the use of those entities primarily as vehicles for fraud by manufacturing false invoices and expenses owed to them by the medical practice. Petitioner does not suggest, nor does it seem likely, that Apostle would have testified that the De'Omilia-related entities could be used to inflate expenses for the purpose of understating income and defrauding the IRS.

(internal quotation marks omitted).  The Court concludes
Petitioner has not overcome this presumption of reasonableness.
Kridel credibly testified at the hearing that Petitioner told
him Apostle "said it's fraud, if you get involved in this,
you're going to go to jail, stuff like that . . . ."  Tr. Oct.
22, 2020, 35:12-13.  Petitioner denies making this statement and
claims Apostle said the plan was sound, but the Court does not
find this testimony credible.

     Petitioner admitted that he fired Apostle after suspecting
Apostle was stealing from him, a perception encouraged by
Sweeton.  Tr. Feb. 24, 2021, 931:25.  "[S]he said, he is
definitely stealing from you, that's why this is happening. . .
. Ms. Sweeton asked me to show her one of the tax returns which
Mr. Apostle had prepared, and she told me that the returns are
not prepared in the appropriate manner and this is significantly
increasing my tax liability."  Id. 933:15-20.  It would be
reasonable for Kridel not to interview Apostle if he thought
Apostle's testimony would hurt Petitioner's defense.  See
Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 372 (3d Cir. 2002)
(noting that counsel "had no duty to investigate witnesses who
contradicted his own client's testimony").

     The Court finds Kridel's testimony to be the most credible
on this issue as it aligns with the trial testimony of
Petitioner's former employee Alexandra Lehr.  Lehr testified at

15

trial that she heard Petitioner tell Apostle that "he was paying too many taxes," to which Apostle responded "[t]he more money you make the more taxes you have to pay."  Crim. Case No. 63 at 1257:13-23.  During the evidentiary hearing Morrison agreed with this assessment of Petitioner's attitude, testifying that he believed Petitioner's goal was to pay as little in taxes as possible and that Sweeton had convinced Petitioner to distrust Apostle.  Tr. Feb. 24, 2021, 881:13-22.[5]

Lehr's testimony at trial supports Kridel's conclusion that Petitioner was unhappy with Apostle's services due in part to the amount of taxes Petitioner was paying.  Lehr further testified at trial that Petitioner and Apostle had a confrontation about "the doctor was going to start using Ginger as the accountant and that Jim Apostle's services were no longer needed."  Crim. Case No. 63 at 1272:6-8.  According to Lehr, Apostle responded "Don't do it, David.  Don't get involved with those people."  Id. at 1272:10-11.  Petitioner's assertion that Apostle assured him that Sweeton's proposal "seemed complex, but sound" is not credible.

The Court concludes after reviewing the record from the trial and evidentiary hearing that there is not a reasonable possibility that Apostle's testimony would have aided

_____

[5] Sweeton ultimately admitted that she fabricated the allegations against Apostle.

16

Petitioner's defense and changed the result at trial.  The
credible testimony of Kridel and Lehr suggests that Apostle
would have testified that he warned Petitioner about going into
business with Sweeton and Wright, that Petitioner fired Apostle
due to Sweeton's influence, and that Petitioner hired Sweeton
and Wright, despite Apostle's warnings, for the specific purpose
of paying fewer taxes whatever the risk might be.  Therefore,
Petitioner's claim fails the Strickland test even if Kridel did
err in failing to interview Apostle and preserve his testimony.

>    2.   Dr. DaSilva

Petitioner alleges Kridel failed to conduct an adequate
investigation into DaSilva.  Specifically, Petitioner alleges
that Kridel failed to investigate: (1) that DaSilva had engaged
in serious fraudulent billing practices; (2) that DaSilva had
submitted false medical records to the American Board of Plastic
Surgery; (3) that DaSilva improperly maintained hospital
credentials without being Board-certified; and (4) that DaSilva
had misclassified employees as independent contractors.  ECF No.
1 at 6.  He asserts that DaSilva's credibility effectively went
unchallenged as a result.

"[A] defendant basing an inadequate assistance claim on his
or her counsel's failure to investigate must make 'a
comprehensive showing as to what the investigation would have
produced.  The focus of the inquiry must be on what information

would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce a different result.'" <u>Brown v. United States</u>, No. 13-2552, 2016 WL 1732377, at *5 (D.N.J. May 2, 2016) (quoting <u>United States v. Askew</u>, 88 F.3d 1065, 1073 (D.C. Cir. 1996)).

At trial, DaSilva stated that he refused to speak with Petitioner's counsel prior to trial.  Crim. Case No. 66 at 1930:16-18.  This reasonably explains why Kridel did not interview DaSilva, but Petitioner has not met his burden of production as to what an adequate investigation of DaSilva would have revealed.  Petitioner speculates as to what investigation of DaSilva's billing records, application records, employment records, etc., would have shown, but the required showing "[may not be based on mere speculation about what the witnesses [counsel] failed to locate might have said." <u>United States v. Gray</u>, 878 F.2d 702, 712 (3d Cir. 1989).

For example, Petitioner relies on Christine Chamberlain's June 24, 2015 statement to prosecutors in which she stated DaSilva ordered the application of ointment to a facial abrasion for an accident victim who "was going to get his organs harvested shortly thereafter." ECF No. 57-12 at 1.  In her opinion, "this [was] simply as an opportunity for Dr. DaSilva to generate a bill." <u>Id.</u>  However, Petitioner has not produced any sworn testimony from Chamberlain confirming she would have

18

testified to this statement during trial had Kridel interviewed her.[6] "In the § 2255 context, other courts have similarly found that a petitioner needs to provide a sworn statement of fact from the proposed witness regarding what they would have testified to if a § 2255 petitioner is to establish Strickland prejudice." Baskerville v. United States, No. 13-5881, 2018 WL 5995501, at *13 (D.N.J. Nov. 15, 2018), aff'd No. 19-3583 (3d Cir. Aug. 13, 2021). See also Duncan v. Morton, 256 F.3d 189, 202 (3d Cir. 2001); Huggins v. United States, 69 F. Supp. 3d 430, 446 (D. Del. 2014) (noting that movant did not provide an affidavit from the witness stating that he would have been available to testify and describing his potential testimony), certificate of appealability denied, No. 14-4129 (3d Cir. Mar. 9, 2015). In the absence of a sworn statement from Chamberlain describing her testimony, the Court cannot conclude that counsel's failure to interview her about the alleged incident was error or prejudiced Petitioner.

The same is true of Petitioner's assertion that Robert Kaschak, a disbarred attorney and associate of DaSilva's, "had ample information about Da Silva's bad acts that could have been used to attack Da Silva's credibility." ECF No. 1 at 7. Petitioner alleges that Kaschak could have testified about other

_____

[6] Chamberlain testified on the government's behalf at trial.

criminal activities in which DaSilva's family participated, but
Petitioner has not produced anything from Kaschak as to what
would have been his testimony at trial.  The Court finds
Petitioner's answers on this point during cross-examination to
be evasive, hostile, and non-specific.  See Tr. Mar. 17, 2021,
1121:1 to 1122:19.  He admitted that "[i]t was never told to me
directly by Dr. DaSilva that Mr. Kaschak represented him in
certain issues . . . ."  Id. 1122:11-12.  The Court finds
credible Kridel's assessment that this evidence was of little
use.[7]  Moreover, as Petitioner himself admitted, it is possible
some of this alleged evidence would have been inadmissible at
trial.  Tr. Mar. 17, 2021, 1124:16-19.

Petitioner wildly speculates as to what may have been found
in DaSilva's billing and other records, but such speculative
evidence does not satisfy Strickland.  The letters from the
American Board of Plastic Surgery and American Board of Surgery
only confirm that all records pertaining to DaSilva, except for
DaSilva's application to the American Board of Surgery, have
been destroyed.  ECF Nos. 57-10, 57-11.  Nothing in the letters
contain any support for Petitioner's assertion that the

---

[7] "[I]t went nowhere. And then there were some other issues about
that David had mentioned that there were holdings in Europe, in
eastern Europe that he might have had, and we were – where are
we going on this? I mean, is this going to help us in a trial? .
. . And it was in [DaSilva's] father's name."  Tr. Oct. 22,
2020, 66:15-20.

unavailable records contained evidence that would have damaged DaSilva's credibility.  The cases cited by Petitioner are distinguishable because the petitioners gave the postconviction courts the evidence they asserted trial counsel failed to uncover.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 532-34 (2003) (finding ineffective assistance of counsel during penalty phase after reviewing social services records and concluding information therein "would have led a reasonably competent attorney to investigate further"); Bond v. Beard, 539 F.3d 256 (3d Cir. 2008) (finding ineffective assistance of counsel during penalty phase after reviewing school records and hearing testimony on family dynamics and background).

The jury certainly understood that DaSilva had a history of significant fraudulent conduct.  As set forth in more detail below, he was a cooperating witness for the government admitting to a substantial tax fraud of his own with Sweeton.  See, e.g., Crim. Case ECF No. 66 at 1829:23 to 1830:6; 1850-51.  Given the substantial criminal conduct to which he admitted, "[t]he value of additional impeachment by reference" to other speculative acts "is of 'little, if any, probative value' because it is impeachment by the same avenue already taken by [Petitioner], namely [the witness'] motivation for testifying . . . as part of a bargained-for reduction in criminal penalties." United States v. Walker, 657 F.3d 160, 186 (3d Cir. 2011).  Assuming these

other bad acts would have been admissible, they would have had little meaningful impact on DaSilva's credibility because he was "already impeached . . . with respect to his self-interested motivation in agreeing to testify against" Petitioner. Id.  See also United States v. Piper, 525 F. App'x 205, 209 (3d Cir. 2013) (holding evidence of key witness' likely admission into state diversionary program was cumulative when witness had already been impeached for her motivation in testifying). Kridel's assessment that he had "enough dirt" on DaSilva was reasonable under the circumstances.  Tr. Oct. 22, 2020, 67:20-24.  Petitioner has not provided the Court with anything but his own unsupported speculations about other fraud by DeSilva, in any event likely cumulative at best.  Therefore, the Court concludes that Petitioner has not satisfied his burden under either prong of Strickland.

   3.   Character Witnesses

   Petitioner presented several character witnesses at trial, but none "who could have supported Evdokimow's defense that he misplaced his trust in Sweeton by testifying that Evdokimow was a gullible and financially unsophisticated person."  ECF No. 64 at 46.  Petitioner alleges Kridel failed to investigate and call Peter Salas, Margaret Timony, Anna Koleva, and Llondy Majumdar as witnesses, all of whom submitted sworn statements and testified at the evidentiary hearing.  The Court concludes from

22

its assessment of the witnesses during the evidentiary hearing that Petitioner has not satisfied Strickland.

Peter Salas, Petitioner's longtime-friend and fellow plastic surgeon, testified at the evidentiary hearing that he believed Petitioner was "over-trusting" and not very sophisticated in financial affairs. Tr. Dec. 9, 2020, 409:25 to 410:11. Salas indicated he came to this conclusion due in part to their mutual victimization by a Ponzi scheme. Id. at 410:12-16. Although one might be able to derive a more generalized opinion or concept from a specific instance or knowledge of specific instances,[8] the fact that someone falls victim to a criminal scheme does not necessarily mean they are a gullible person. Salas testified that the scheme garnered a $250 million loss, Tr. Dec. 9, 2020, 417:10, and surely not all the victims could be considered "gullible" solely by virtue of being defrauded. Even the most educated and financially savvy people can be crime victims, Salas himself among them.

Salas testified that he considered Petitioner to be especially unsophisticated "specifically because he invested additional funds in that scheme . . . ." Id. 418:19-21. Presenting this evidence may have backfired and suggested to the jury that Petitioner was always looking for get-rich-quick

---

[8] The Court excluded evidence of specific instances in which Petitioner was taken advantage of at trial.

schemes.  <u>See</u> Tr. Oct. 22, 2020, 58:9-13 (Kridel: "That could
have been read two ways.  It could have been read as to
gullibility, or it also could have been read as to greed.  There
was small money put down with the potential of making big
money.").  As the Third Circuit acknowledged, there was
"extensive evidence that contradicted Evdokimow's account that
he was unaware of and uninvolved in the tax fraud."  <u>Evdokimow</u>,
726 F. App'x at 896.  Therefore, the Court concludes that there
is not a reasonable probability that the jury would have had "a
reasonable doubt respecting guilt" even if Salas had testified
at trial.  <u>See</u> <u>Strickland</u>, 466 U.S. at 695.

The Court also concludes that Petitioner has not shown
Kridel acted unreasonably by not calling Llony Majumdar,
Petitioner's banker, as a witness.  Kridel deposed Majumdar
during Petitioner's civil suit against Sweeton and met with
Majumdar in Petitioner's presence several times, giving Kridel
several opportunities to assess her suitability as a trial
witness.  Kridel testified that he was concerned that Majumdar
had structured Petitioner's deposits, Tr. Oct. 22, 2020, 48:2-
14, and that she "had too much baggage."  <u>Id.</u> 50:22.  He was
also concerned that she had lied to federal agents about the
number of times they had met.  <u>Id.</u> 47:13-18.  "I thought she
would hurt David if she testified, especially on cross."  <u>Id.</u>
48:21-22.

Considering her demeanor and statements during the evidentiary hearing, the Court concludes it was a reasonable decision not to call Majumdar as a witness.  She was evasive in her responses and appeared to have a conflict of interest because of her involvement in DaSilva's and Petitioner's banking practices, which were highly unusual at best.  See, e.g., Tr. Feb. 3, 2021, 516:1 to 518:16.  By way of just one example, Majumdar testified she had an arrangement with Petitioner in which he would regularly send dozens of checks from his medical practice in New Jersey by FedEx to be cashed by her in the Long Island bank branch she oversaw.  Id. 495:21 to 496:4.  This despite the fact that her bank had a branch in New Jersey close by Petitioner's medical practice.  Id. 496:8-13.

As the cross-examination of Majumdar makes clear, the jury may well have concluded that Petitioner choose Majumdar because she was willing to ignore the red flags raised by Petitioner's cash checking activities despite her training and experience as a banker.  In short, Majumdar would have been vigorously cross-examined about her role as DaSilva's and Petitioner's banker had she testified at trial.  Majumdar testified that she would laugh with her colleagues about Petitioner and call him an "idiot," Tr. Dec. 9, 2020, 432:8-19, raising questions about whether she may have manipulated Petitioner for her and her bank's benefit.

"[I]t is critical that courts be 'highly deferential to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight." <u>Marshall v. Hendricks</u>, 307 F.3d 36, 85 (3d Cir. 2002).  The Court finds Kridel's testimony regarding Majumdar to be credible.  Accordingly, Petitioner has not shown that Kridel's decision fell below an objectively unreasonable standard.

The Court also finds that it was within the range of reasonable trial strategies for Kridel not to call Margaret Timony, Petitioner's realtor, as a witness.  Kridel testified he was concerned about presenting her as a witness because Petitioner lent her $16,000 and "that might raise a flag as to that she might be more favorable than unfavorable because David provided money for her."  Tr. Oct. 22, 2020, 56:3-4.  Kridel's concern that Timony might appear to be "beholden" to Petitioner is a valid and reasonable concern based on the Court's assessment of Timony during the evidentiary hearing.

Timony testified that she thought Petitioner was too trusting in financial matters because he failed to ask questions about transactions and took "things at face value."  Tr. Feb. 3, 2021, 581:20-22.  The primary foundation for this testimony appears to be that Petitioner did not question the price of a property she found for him to buy and he did not use the property immediately for the stated purpose of a surgical

26

center.  Id. 582:1-14.  As the government's cross-examination
made clear, and would likely not have been lost on a jury, it
was Timony who appeared unsophisticated as she never appreciated
the possibility that Petitioner lacked concern over price
because his main goal was to hide money – to use real estate to
launder the literally hundreds of thousands of dollars he was
siphoning off his medical practice.  Tr. Feb. 11, 2021, 646:9 to
649:5.  Like Majumdar, Timony would have likely provided as much
evidence of Petitioner's shady practices as his lack of
sophistication.

Moreover, in spite of this belief that Petitioner was far
too trusting in financial matters, Timony accepted a $16,000
loan from him to pay her taxes.  Tr. Feb. 3, 2021, 587:17-18,
592:12-15.[9]  She conceded she had never borrowed money from her
clients before.  Id. 593:18-20.  Significantly, Timony borrowed
the money in April 2014 despite having learned Petitioner was
being investigated for tax evasion in February 2012.  Tr. Feb.
11, 2021, 622:13 to 623:16.[10]  The timing of the loan combined

[9] Kridel's office prepared the loan documents, Tr. Oct. 22, 2020,
55:11-13, and Timony repaid the loan in full, Tr. Feb. 3, 2021,
585:3-11.

[10] Timony originally stated during cross-examination that she did
not think she would have borrowed money from Petitioner after
learning he was being investigated for tax fraud because she
"wouldn't have wanted to get involved."  Tr. Feb. 3, 2021,
592:3.  She later corrected herself after discovering a letter

with Timony's admission that she was "in a very bad position" and "desperate at the time and [Petitioner] came up with a solution" detracts from the credibility of her testimony about Petitioner's gullibility.  Id. 635:14-24.  "[I]t just all fell into place and it was a way out . . . ."  Id. 635:15-16.  In all, the Court concludes Timony would not have been a credible, or even if believed, a particularly helpful witness on Petitioner's behalf and Kridel's decision not to put her on the stand was a reasonable strategy under the circumstances.

The Court also concludes Anna Koleva, the mother of Petitioner's child, would not have been a credible witness on this point.  Koleva was financially dependent on Petitioner at the time of trial and would have had a significant interest in his acquittal.  See Tr. Feb. 3, 2021, 559:19-20 ("I lived comfortable life provided by Dr. Evdokimow . . . .").  She stated she based her opinion of Petitioner's gullibility on her "observations of him getting pissed about money he cannot collect back."  Id. 569:16-17.  "I know that money got out of his account and were never collected."  Id. 570:3-4.  Financial gullibility is not the same thing as being upset over being unable to collect money that is owed, and there is not a reasonable possibility that Koleva's testimony on her opinion of

_____

dated February 2012 that informed her of the investigation.  Tr. Feb. 11, 2021, 622:5-13.

28

Petitioner's gullibility would have ended in a different result. Considering Koleva's interest in a particular result at trial and the very minimal probative value of her testimony, Kridel's decision was "within the realm of reasonableness and does not violate the dictates of Strickland." Porter v. Adm'r of New Jersey State Prison, No. 20-2048, 2021 WL 2910944, at *3 (3d Cir. July 12, 2021) (finding state courts reasonably applied Strickland in concluding decision not to call alibi witness due to potential bias was "tactical and sound trial strategy").

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). See also Berryman v. Morton, 100 F.3d 1089, 1101 (3d Cir. 1996) ("The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued."); Judge v. United States, 119 F. Supp. 3d 270, 284-85 (D.N.J. 2015) ("Where a petitioner challenges his counsel's decision as to which witnesses to call, courts are required not simply to give the attorney the benefit of the doubt, but to affirmatively entertain the range of possible reasons petitioner's counsel may have had for proceeding as he did.")(internal citations omitted).

Basil, who conducted the direct testimony of the character witnesses at trial, testified during the evidentiary hearing that he "hadn't prepared anybody on the question of [Petitioner's] character for gullibility, and I didn't think that his character – because I didn't think that was particularly worthwhile. . . .  I just didn't make the effort because I didn't think that that evidence was particularly helpful.  I thought my efforts were better placed elsewhere." Tr. Dec. 9, 2020, 383:9-12, 384:3-6.

After consideration of the proposed witnesses' testimonies at the evidentiary hearing, the Court concludes this was a reasonable strategy.  Petitioner has not shown that Kridel or Basil acted outside the wide range of reasonable strategic trial decisions.  Furthermore, the Court concludes that the character witnesses would not have been credible at trial and their testimonies' absence from trial does not call the verdict into doubt.  It is as likely their testimony would have hurt Petitioner as it would have helped him.  Accordingly, Petitioner has not shown a violation of Strickland.

4.   Diane Meyers

Diane Meyers, Petitioner's former employee, testified for the Government at trial.  Petitioner argues "[b]ecause Kridel failed to interview Meyers, with no reason for not doing so, by the time she was to testify, Evdokimow's defense team had no

30

idea what to expect from her." ECF No. 1 at 28. Petitioner alleges that Kridel told Koleva that it would be okay for her to call Meyers and get any information she could. ECF No. 1 at 28.

The Government elicited information about the phone call during Meyers' direct examination at trial. Crim. Case No. 64 at 1443:21-24. After excusing the jury for its regular mid-afternoon break, the Court questioned Meyers about the call and what her belief was as to why Koleva contacted her. Id. at 1458:11 to 1460:4-5. Meyers responded that she did not know. Id. at 1460:4-5. The Court then asked Kridel if he knew anything about the call, and Kridel responded "[n]o. I think the only thing that it might have been was that we were at one time contemplating calling [Meyers] as a character witness. She was listed on a list that we had proposed. I have no idea." Id. at 1460:13-16. He further stated that "[i]f someone did, it was not for any reason that I could tell you, so it wasn't at my direction." Id. at 1461:2-3; see also id. at 1464:8-10 ("I can tell you that I have had no communication with [Koleva] calling Meyers."). During the evidentiary hearing, Kridel testified that he "said I'm not going to advise [Koleva] one way or the other, but she cannot suborn perjury. So, I said I'm not going to get on the phone and tell her one way or the other because she was not my client. That's what I said." Tr. Feb. 11, 2021, 689:20-24.

31

The Court has serious concerns about Kridel's candidness to the Court's inquiries about his knowledge at the time of trial and during the evidentiary hearing.  Koleva's testimony about a dinner meeting in which she discussed contacting Meyers with Kridel's knowledge if not tacit approval appeared credible and undermined Kridel's assertion to the Court he "he knew nothing about it."  However, the Court concludes Petitioner has not shown that he was prejudiced for purposes of Strickland and § 2255.

The exchange before the jury was brief:

Q. And are you familiar with Anna Koleva?

A. Yes.

Q. And how do you know her?

A. She was — through Dr. Evdokimow, she was Dr. Evdokimow's partner.

Q. And did you meet Ms. Koleva?

A. Yes, I did.

Q. And when was the last time that you spoke with her?

A. Probably three years ago.

Q. Has she tried to call you since then?

A. Yes.

Q. And when was that?

A. Last evening.

Crim. Case No. 64 at 1443:12-24.

The Government did not inquire further, and the jury was excused before the Court questioned Kridel.  Petitioner argues this incident demonstrates "the extent of Kridel's unprofessionalism," ECF No. 64 at 74, and undermines Kridel's credibility, id. at 77-78, but does not provide convincing evidence that supports a reasonable probability that the result of trial would have been different had Kridel interviewed Meyers before trial.  Petitioner carries the burden of proof in § 2255 proceedings, and he has not met this burden for this claim.

    5.   <u>Summary</u>

After considering the testimony from the hearing and submissions by the parties, the Court concludes that Petitioner has failed to demonstrate a reasonable probability that the result of trial would have been different had counsel conducted his pretrial investigation in the manner set forth by Petitioner.  Petitioner has not produced statements from Chamberlain and Kaschek regarding their knowledge of DaSilva's alleged bad acts, and Petitioner's speculation about DaSilva's records is not evidence.

Petitioner has not shown that Kridel acted in an objectively unreasonable manner regarding the witnesses about Petitioner's financial knowledge or lack thereof.  Nor is there a reasonable probability that their testimony would have affected the jury's determination when weighed against DaSilva's

testimony about Petitioner's active participation in the scheme. The Court was left with the strong impression that the witnesses would not have been credible or particularly helpful in their defense of Petitioner.  Finally, Petitioner has not shown any prejudice to his defense due to counsel's failure to interview Meyers prior to trial.  The Court concludes that Petitioner has not met his burden of proof under Strickland and will deny relief under § 2255.

C.   Violation of Attorney-Client Privilege

Petitioner further asserts Kridel breached the attorney-client privilege by sharing trial strategy with the Government. He alleges that "after Evdokimow informed Kridel about Da Silva's problems with fraudulent billing, Board certifications, and improperly maintained hospital credentials, the garrulous Kridel tipped off the prosecutors" who were able to prepare DaSilva for these attacks on his credibility.  ECF No. 1 at 33. "Kridel likewise shared with the government confidential information about Evdokimow's trial strategy with respect to Sweeton; as a result, after indicating all along that it intended to call Sweeton as a witness, the government suddenly reversed course and decided not to call her."  Id.  "More specifically, tipping off the government about his strategy during phone calls with prosecutors shortly before trial, for which Evdokimow was present in Kridel's office, Kridel said he

34

would 'destroy' Sweeton on the stand, describing exactly how he would do that."  Id. at 34.

The Third Circuit has found violations of the Sixth Amendment right to counsel "when the government (1) intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant."  United States v. Costanzo, 740 F.2d 251, 254 (3d Cir. 1984) (citing Weatherford v. Bursey, 429 U.S. 545 (1977)).  No showing of prejudice is required when "attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case."  United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978).

In Levy, trial counsel represented two co-defendants; unbeknownst to counsel, one of the defendants was a government informer.  Id. at 202-04.  Counsel withdrew from representing the informant after learning that fact, but the damage had already been done.  The informant was able to learn, and had specifically been asked to find out, the defense's trial

35

strategy.[11]  The Third Circuit concluded "that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case."  Id. at 209.

Petitioner argues this presumption of prejudice must apply here as well, but Levy's holding is limited to cases where "confidential defense strategy is disclosed to the government by an informer."  Costanzo, 740 F.2d at 257 (emphasis added). "Levy crafted a three part test examining: (1) intentional government conduct, (2) attorney-client privilege, and (3) the release of confidential legal strategy.  When those circumstances coalesce, Levy dispenses with an inquiry into whether the defense was prejudiced."  United States v. Mitan, 499 F. App'x 187, 192 (3d Cir. 2012).

The Court of Appeals further acknowledged that Levy's viability was called into doubt by the Supreme Court,[12] but noted that defendant could not obtain relief under Levy in any event "because he cannot show that the government intentionally

---

[11] There were additional conflicts due to counsel's representation of the informant in state court proceedings, but these are the facts relevant to Petitioner's claims.

[12] See United States v. Morrison 449 U.S. 361 (1981) (holding indictment's dismissal was unjustified absent showing of prejudice to counsel's ability to provide adequate representation).

invaded any attorney-client relationship." Id. Likewise, Petitioner has not shown, nor does he claim, that a government informer surreptitiously provided his defense strategy to the United States or that the United States took any intentional action to interfere with his attorney-client relationship. Therefore, the Court reviews this claim under the Strickland standard.

The Court concludes that Petitioner has not shown that Kridel violated the attorney-client privilege or that he was prejudiced.  Petitioner argues Kridel's disclosures to the Government prompted the Government to prepare DaSilva for specific questions on cross-examination, "mold the testimony of Grigor Damyanov," and influenced the Government not to call Sweeton as a witness.  Evdokimow Cert. ¶¶ 24-26.  This is pure speculation.  There is no credible evidence in the record that Kridel revealed any privileged information or that the Government altered its trial strategy because of anything Kridel said.  It is expected that defense attorneys will attack the credibility of government witnesses, and the government will naturally prepare its witnesses for such cross-examination. Petitioner has not shown that Kridel made an error so serious it amounted to incompetence.

Petitioner also has not established a reasonable probability that the trial's outcome would have been different.

As discussed supra, there is no support for Petitioner's claims
that DaSilva fraudulently billed clients or submitted false
statements in his applications.

Damyanov did not testify at the evidentiary hearing, but
certified that he "learned a lot about how the FBI viewed their
evidence, and they ultimately got me to testify that I would not
trust Dr. Evdokimow" and "Kridel's complete failure to
communicate with me not only meant that I never knew Dr.
Evdokimow's side of the story, but also made me regret my
initial inclination to help Dr. Evdokimow and to turn against my
friend."  Certification of Grigor Damyanov ("Damyanov Cert."),
ECF No. 57-26 ¶ 7.

The evidence at trial showed that Petitioner used Damyanov
to open bank accounts for businesses that did not exist and
performed no legitimate services, among other things.
Petitioner created a stamp from Damyanov's signature on a blank
piece of paper and used that stamp to move money between
accounts without Damyanov's knowledge.  At trial, Government
asked Damyanov if he trusted Petitioner "as a friend and someone
that you would sign a piece of paper for and give him your
signature to create a stamp?"  Crim. Case No. 61 at 689:22-24.
Damyanov stated that he still "trust[ed] [Petitioner] as a
doctor" but would not "sign a piece of paper to anybody, blank
piece of paper no."  Id. at 689:21, 689:25 to 690:1.  He did not

provide any information in his certification as to how his testimony would have changed if Kridel had "just stayed in touch" with him.  Damyanov Cert. ¶ 7.  In fact, nothing in the Damyanov certification changes the clear import of his testimony at trial, that Petitioner used Damyanov's signature, without his knowledge, to create the illusion that it was someone other than Petitioner on the other side of the transactions.  Accordingly, there is insufficient evidence for the Court to conclude there is a reasonable possibility that the outcome would have been different.

Finally, the Court finds Petitioner's argument about Sweeton's failure to testify unpersuasive.  Petitioner does not assert that Kridel should have called Sweeton as a witness and concedes "her testimony, on the whole, likely would not have been favorable to Evdokimow."  ECF No. 57 at 75.  Instead, he asserts that Kridel's failure to prepare for the possibility that Sweeton would not testify at trial prejudiced him because it prevented the introduction of her statement "that, at the time she served as Evdokimow's accountant, she did not know that what she was doing was illegal."  ECF No. 64 at 59.  "Aware of such a powerful exculpatory statement, Kridel was obligated to conduct an investigation to potentially locate evidence that — were the Government to decide not to call Sweeton, as it

ultimately did — could have made the point that Sweeton's statement would have." Id. at 58.

Petitioner's assertion that Kridel could have "potentially locate[d] evidence" is not enough to show prejudice under Strickland. "When a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced." United States v. Lathrop, 634 F.3d 931, 939 (7th Cir. 2011). See also Judge v. United States, 119 F. Supp. 3d 270, 286 (D.N.J. 2015). Petitioner admitted at the hearing that he "really [didn't] know what M[s]. Sweeton would have testified." Tr. Mar. 17, 2021, 1114:25 to 1115:1. "[She] could have testified one way or another. I think it's unfair question to ask me what Ms. Sweeton going to testify. I cannot potentially — I cannot know that." Id. 1115:1-3. Therefore, his "suggestion that the evidence 'undoubtedly' would have been favorable to him is unsupported by the record and wholly speculative." United States v. Garvin, 270 F. App'x 141, 144 (3d Cir. 2008).

Sweeton's statement to Department of Justice attorneys "that she didn't believe she had done anything wrong," Tr. Oct. 28, 2021, 252:8 (Kridel cross-examination), is definitively refuted by Sweeton's own guilty plea. On August 24, 2015,

40

Sweeton pled guilty to a one-count Information charging her with aiding and assisting in the preparation and presentation of false tax returns, 26 U.S.C. § 7206(2).  United States v. Sweeton, No. 15-cr-0419 (D.N.J. Aug. 24, 2015) (ECF No. 4); ECF No. 63-1.  In pleading guilty, Sweeton admitted that she helped Petitioner prepare and present a 1040 Form that she "knew to be fraudulent and false as to material matters" and "was illegal under the tax laws of the United States[.]"  ECF No. 63-1 at 5. Even if her prior statement had somehow been introduced at trial, Sweeton's subsequent guilty plea made that prior denial essentially worthless.

To summarize, the Court concludes that Petitioner has not carried his burden under Strickland to show that he was prejudiced by any alleged failure to investigate Sweeton.  "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of his trial."  United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).

Petitioner has not specifically identified what evidence Kridel should have uncovered that would have "made the point that Sweeton's statement would have," and only speculates that it exists at all.  Accordingly, the Court will deny this ground for relief.

D.   Inadequate Trial Performance

Petitioner's next set of allegations concern trial counsel's performance during trial.

1.   William Morrison, CPA

Petitioner asserts that Kridel failed to prepare and properly present the expert testimony of forensic accountant William Morrison.  "Had it been properly prepared and presented, consistent with prevailing professional norms, Morrison's analysis would have established that Evdokimow misplaced his trust in Sweeton, who altered his records without his knowledge and then filed false tax returns on his behalf."  ECF No. 57 at 49-50 (internal citation omitted).  "[] Morrison's testimony, along with the summary documents he prepared, was compelling proof that Sweeton altered Evdokimow's records without his knowledge and then filed false tax returns on his behalf."  ECF No. 64 at 35.  "Only minutes before Morrison testified, however, Kridel informed him that he would not elicit the most important part of Morrison's analysis — that Evdokimow's records demonstrated that Sweeton, and not Evdokimow, was responsible for the false information in the tax returns filed on Evdokimow's behalf."  ECF No. 57 at 50.

Petitioner specifically faults Kridel for not properly introducing Morrison's summary documents that "would have demonstrated to the jury the Evdokimow lacked financial

sophistication because he made clear mistakes in his office QuickBooks files" and "whatever Evdokimow's good faith mistakes, Sweeton exacerbated them without his knowledge by simply increasing Evdokimow's other expenses by several hundred thousand dollars to levels that had 'no basis in reality.'"  Id. at 51.  See also ECF No. 57-21 (Trial Exhibits 1554 and 1555). Morrison's final trial summary concluded in relevant part that: (1) "The income on Dr. Evdokimow's QuickBooks for De'Omilia for 2006-2008 was significantly higher than the income shown on the tax returns prepared by Ginger Sweeton"; (2) "Ginger Sweeton prepared the tax returns and lowered the income by creating expenses for which there was no justification"; and (3) "There are no records or documentation to justify Ginger Sweeton's changes to the De'Omilia's expenses or the basis for same."  ECF No. 57-45 at 14.

Morrison did testify to these conclusions on direct:

Q. So, the flow was, to summarize what you said, to make it clear, the flow was from the doctor's office of QuickBooks to Ms. Sweeton, there were adjustments made by Ms. Sweeton, and then returns prepared; is that correct?

A. That's correct.

Q. And it's your testimony today, is it not, Mr. Morrison, that the — she reduced income by both arbitrarily just reducing income and also by increasing expenses; is that correct?

A. That's correct.

43

> Q. How did you determine — well let me ask you this first. Did you make any — did you determine or opine at all to whether or not the adjustments made by Ginger Sweeton made any sense?
>
> A. Yes.
>
> Q. What was your finding?
>
> A. They didn't make any sense, did not.

Crim. Case No. 68 at 2387:15 to 2388:6. See also Id. 2388:8-24. He further stated that Petitioner's returns had "red flags" and "were begging to be audited." Id. at 2390:13-14.

Petitioner's argument as to the impact of Morrison's testimony is fundamentally flawed, begging the question by assuming the truth of its conclusion. Sweeton's altering of Petitioner's financial information only proves that there was no conspiracy if one starts with the assumption that Sweeton and Petitioner did not enter into an agreement in which Sweeton would be free to adjust the expenses in a way that would minimize Petitioner's tax liability. Without starting with that presumption, it is possible to conclude that Petitioner provided Sweeton with his financial documents for the express purpose of using the provided information as a starting point for the false returns. After all, it would be impossible to reduce Petitioner's tax liability if Sweeton did not have any knowledge of Petitioner's true financial situation.

Petitioner's argument is unpersuasive without consideration of the flawed premise.  Morrison admitted that he never spoke with Sweeton and Petitioner together and that he did not know what agreement, if any, existed between Sweeton and Petitioner. Tr. Feb. 24, 2021, 852:9-17.  He conceded that Petitioner would be in the best position to know the real expenses of his practice and "wanted to pay as little [in taxes] as possible." Id. 866:1-15.  Faced with the startling numbers and returns that, in Morrison's words, "were begging to be audited," it was not unreasonable for Kridel to conclude that he "didn't want to, I believe his phrase was focus on the numbers, because the numbers wouldn't help us.  He wanted to focus on Dr. Evdokimow's intent."  Tr. Feb. 17, 2021, 798:19-21.  The fact that Sweeton prepared the filings and created numbers out of thin air does not tend to show that Petitioner was acting in good faith when he signed the returns.

Kridel understood that "[t]he numbers were not in our favor," and "did not want to have [Morrison] go through the numbers . . . because [Kridel] thought the jury was going to be clear about the numbers."  Tr. Oct. 22, 2020, 69:18, 73:5-8.  "I didn't think we wanted to show big numbers anymore.  When you show the jury millions and millions of dollars, it looked bad for us."  Id. 73:8-11.  Trials are fluid in nature, and a strategy crafted during the pretrial phase may need to adapt to

45

the evidence and testimony presented at trial.  The Court is not persuaded that Kridel acted unreasonably in declining to highlight the exact numbers in Morrison's reports even if that decision was made immediately prior to Morrison's testimony.

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688.  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-899.  Counsel must be flexible and must be able to make snap decisions based on how trial progresses, and counsel is not incompetent simply because the defense strategy did not work out as well as hoped.  Id. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . .").

The Court is also not persuaded that Morrison was unprepared for trial.  He agreed that he met with Kridel "many, many times over the course of the case." Tr. Feb. 17, 2021, 800:14-15.  Anne Heldman, Kridel's associate during trial, testified that they had "too many [meetings] to count" and "Mr. Morrison was very involved as we were progressing . . . ." Tr. Apr. 6, 2021, 1242:2.  She testified that as trial approached

46

"and it became necessary to prepare him as a witness, we would run through possible questions, and Mr. Morrison gave us his input as well as to what he wanted to discuss."  Id. 1242:21-24. She denied that Morrison ever told her that he felt unprepared to testify, and she specifically remembered reviewing the exhibits with him.  Id. 1244:5-17.

The numbers involved in the fraud were staggering, and Morrison's cross-examination "was damaging, however, there is no indication that better preparation by [Petitioner's] attorney would have changed what transpired."  United States v. Kane, 944 F.2d 1406, 1414 (7th Cir. 1991).  Petitioner faults Kridel for not drawing out Morrison's opinion that Petitioner could not have known about Sweeton's changes because "[t]here was nothing sophisticated.  There was nothing tricky.  My experience is, when you have someone who is trying to commit tax fraud, they're doing it in a more sophisticated manner."  Tr. Feb. 24, 2021, 874:21-24.  See ECF No. 57 at 52.

However, tax fraud that is "amateurish" and "lacking in sophistication" is still tax fraud.  Tr. Feb. 24, 2021, 874:25. Morrison was not in the best position to testify as to Petitioner's state of mind; the best person to do that was Petitioner.[13]  Overall, the Court finds Kridel's and Heldman's

---

[13] Petitioner did not raise any claims relating to his own testimony.

testimonies to be most credible on this issue and finds that Petitioner has not satisfied the Strickland standard.

2.   DaSilva's Cross-Examination

Petitioner's argument that DaSilva's cross-examination was ineffective due to Kridel's errors fails under Strickland as well.  Primarily, Petitioner has not provided the Court with competent evidence of what information should have been used. As the Court noted supra in its discussion of Kridel's alleged failure to investigate DaSilva, Petitioner only speculates what evidence could have been used against DaSilva.  The Court cannot assess the impact speculative evidence may have had on cross-examination.

Moreover, the Court disagrees with Petitioner's characterization of Basil's cross-examination as "weak and ineffective."  ECF No. 57 at 90.  Basil "pointed out many issues of perjury [Da Silva] had committed before the trial ever began, the details of his plea agreement, his animosity toward Evdokimow, and other issues geared toward having the jury disbelieve his damaging testimony."  Declaration of Robert J. Basil ("Basil Dec."), ECF No. 57-28 ¶ 19.  This aligns with the Court's recollection of trial.  See Gov't of Virgin Islands v. Nicholas, 759 F.2d 1073, 1077 (3d Cir. 1985) ("[I]t was appropriate for the trial judge to draw upon his personal knowledge and recollection in considering the factual

48

allegations in the . . . 2255 petition that related to events
that occurred in his presence.").

On direct, DaSilva admitted that he transferred money from
his professional corporation "into the shell corporation bank
accounts for services that were never rendered, for supplies
that were never bought, . . . for leases that were never
legitimized undertaken" for the purpose of evading taxes.  Crim.
Case ECF No. 66 at 1829:23 to 1830:6.  He admitted he knew that
Sweeton "was fabricating invoices to expense the money out of
the PC into the shell corps."  Id. at 1850:11-12.  He admitted
that he "knew that what [he] was doing was tax evasion."  Id. at
1851:25.  He admitted that he pled guilty to filing false
returns and faced up to three years in jail and a restitution
obligation in excess of $3 million.  Id. at 1868:19 to 1869:12.

On cross-examination, DaSilva admitted that he signed
multiple tax returns each year between 2005 to 2009 knowing they
were false.  Id. at 1919:13-22.  He further admitted that he
started this scheme for the purpose of shielding his assets
during his divorce and pending malpractice lawsuit.  Id. at
1922:22 to 1923:6.  The jury knew DaSilva cheated on his taxes
for many years, took actions for the specific purpose of
protecting his assets from his ex-wife and malpractice lawsuit,
and had entered into an agreement with the United States with
the hope for a lenient sentence from the Court and still found

him to be credible as to Petitioner's involvement, including Petitioner's use of code words to refer to the shell corporations.

Petitioner briefly argues that Kridel erred by not "fully exploit[ing] the contradictions" between DaSilva's description of a 2011 meeting he and Petitioner had with accountants Balachander Venkataramanan and Shanti Kumar, and the accountants' descriptions of the meeting.  ECF No. 1 at 14. Petitioner asserts this testimony "could easily have used these contradictory version of events not only to attack Da Silva's credibility and undermine his testimony that he just wanted to 'get . . . out of this mess.'"  Id.

However, Basil did attack the sincerity of DaSilva's alleged desire to "come clean" in an exchange that ultimately required the Court to instruct DaSilva, outside of the jury's presence, to answer counsel's questions.  Crim. Case No. 66 at 1949:13 to 1952:24, 1956:10-22.  If there was an error in failing to fully explore this inconsistency, and the Court makes no finding that it was, "[n]othing in the evidence presented shows that counsel's errors in his cross-examination . . . were so serious, in light of all the evidence and jury instruction, to deprive the defendant of a trial whose result is reliable." United States v. Travillion, 759 F.3d 281, 293 (3d Cir. 2014).

The Court concludes Petitioner has not satisfied either prong of
the Strickland analysis.

### 3.   Alcohol Use and Exhaustion

Petitioner also asserts Kridel's trial performance was
negatively impacted by his substantial alcohol use during trial
and exhaustion.  "[T]he general allegations of alcohol use do
not require a departure from Strickland's two-prong standard . .
. .  Alcohol or drug use by trial counsel can certainly be
relevant to both parts of an ineffectiveness inquiry, especially
if amplified or systemic, or on close questions of strategy and
jury perception."  United States v. Washington, 869 F.3d 193,
204 (3d Cir. 2017).

The testimony at the hearing, including Kridel's own
testimony, shows that Kridel drank wine or scotch, as did most
of the other dinner guests, during dinner with Petitioner and
the defense trial team.  However, there is no credible evidence
that supports a finding that he ever drank to excess or that
Kridel was under the influence of alcohol or hungover during
trial.  The Court recollects Kridel's demeanor and performance
during trial and did not observe anything during the twelve-day
trial that indicated excessive alcohol use.  See United States
v. Anderson, 832 F. App'x 284, 287 (5th Cir. 2020) (per curiam)
("[A] district court does not have to assess evidence in a
vacuum and can use its own knowledge of the record, its

observations from trial, . . . .").  This recollection is supported by the credible testimony of Kridel, Basil, and Heldman at the hearing.  Basil emphatically denied seeing any evidence of intoxication during trial and stated he "would not have tolerated that."  Tr. Dec. 9, 2020, 352:8.

Petitioner's assertion that Kridel was in such bad shape one day that Heldman had to "[take] care of [Kridel] until he got up" and Kridel was "not able to function that day" is not credible over Heldman's denial of that incident.[14]  Tr. Mar. 4, 2021, 1018:7-11; Tr. Apr. 6, 2021, 1249:11-24.  Heldman no longer works for Kridel and has no interest in the outcome of these proceedings; her testimony is far more credible than Petitioner's absurd claim.  Accordingly, Petitioner has not shown that Kridel used alcohol to the point that he was not functioning as counsel.

Petitioner also claims Kridel fell asleep at several points during trial "and the members of the jury had noticed it.  On

---

[14] Contributing to the incredibility of Petitioner's accusation is his change in testimony as to when during trial this incident allegedly occurred.  Petitioner originally certified this incident took place on a Saturday two days before closing arguments.  Evdokimow Cert. ¶ 30.  However, he testified during the evidentiary hearing that Kridel was too hungover to function on Veterans Day, Wednesday November 11, 2015.  Tr. Mar. 4, 2021, 1017:21-25.  The Court is not convinced by Petitioner's stated reason for this discrepancy that he was "confused" as to the date because he was in prison, id. 1018:23-25; discovering one's attorney to be bedridden and requiring an associate to care for him would be a remarkable, highly memorable incident.

these occasions, Heldman had to wake Kridel up."  Evdokimow
Cert. ¶ 29.  Damyanov certified that he noticed that Kridel fell
asleep during his direct testimony.  Damyanov Cert. ¶ 10.  Basil
testified that he never saw Kridel sleeping during trial.  Dec.
9, 2020, 351:21-23.  Heldman testified that she did not recall
Kridel falling asleep during Damyanov's testimony, Tr. Apr. 6,
2021, 1278:15, and had no recollection of Kridel sleeping during
trial, id. 1250:25.  She did remember Kridel falling asleep
during jury instructions, however.  Id. 1277:21-25.

The Supreme Court has recognized a narrow exception to
Strickland's prejudice requirement, where "circumstances [] are
so likely to prejudice the accused that the cost of litigating
their effect in a particular case is unjustified."  United
States v. Cronic, 466 U.S. 648, 658 (1984).  To date, neither
the Supreme Court nor the Third Circuit has considered whether
Cronic's presumption of prejudice applies when defense counsel
falls asleep, but the Third Circuit has "assume[d] without
deciding that it does, and use[d] the standard set forth by our
sister Courts of Appeals which have considered the issue: that a
defendant is entitled to a Cronic presumption of prejudice where
counsel was asleep for a substantial portion of the trial or at
a critical point in the trial."  United States v. Massimino, 827
F. App'x 176, 177 n.1 (3d Cir. 2020).  See also United States v.
Best, 831 F. App'x 610, 613 (3d Cir. 2020) (finding defendant

had not shown counsel "slept at all during trial, let alone during a substantial portion of it"); Birthwright v. Johnson, No. 18-14019, 2020 WL 416183, at *8 (D.N.J. Jan. 27, 2020) (noting courts "have required at the very least that counsel sleep through a critical juncture at trial or sleep through substantial portions of trial to warrant application of a presumption of prejudice"), certificate of appealability denied, No. 20-1394 (3d Cir. July 30, 2020).  The Court is persuaded by the reasoning in Massimino that the Cronic presumption only applies to Petitioner's claim if he has shown that Kridel slept through either a critical stage of trial or for a substantial portion.

The Court concludes Petitioner has not shown Kridel slept during substantial portions of the trial.  The Court did not observe Kridel sleeping at all much less during substantial portions, and this recollection accords with Basil's and Heldman's testimony on this point.  See Tanner v. United States, 483 U.S. 107, 125 (1987) ("The District Court Judge appropriately considered the fact that he had 'an unobstructed view' of the jury, and did not see any juror sleeping."); United States v. Donahue, 792 F. App'x 165, 167 (3d Cir. 2019).  The Court credits Heldman's testimony that Kridel fell asleep during jury instructions, but there is no credible evidence that he fell asleep at any other time or ever for an extended period.

Although it can be said as a general proposition that jury instructions are a critical stage of any trial, "[c]ourts do not presume prejudice [under Cronic] when more than one attorney represents a defendant." Alvarez v. Davis, No. 4:09-CV-3040, 2017 WL 4844570, at *32 (S.D. Tex. Oct. 25, 2017), appeal filed, No. 18-70001 (5th Cir. Jan. 18, 2018); accord Hall v. Thaler, 504 F. App'x 269, 277-78 (5th Cir. 2012). Basil actively participated at trial and was present and attentive during the jury instructions. Therefore, the Court reviews the claim under the traditional Strickland standard, meaning Petitioner must be able to show prejudice from Kridel's inattentiveness during jury instructions.

The Court concludes there was no prejudice from Kridel's apparently momentary lapse. The Court spent a considerable timing working with counsel on the final set of instructions and ruling on all objections and finalizing the instructions, a process in which Kridel was actively and vocally involved. Each side was given a copy of the instructions, and Kridel and Basil had ample opportunity to contribute and object to them, and to review the final version, which they did. See Crim. Case No. 70 at 2855:22 to 2857:13; No. 73 at 2876:19 to 2880:10, 3000:22-24, 3004:1-3. To the extent constitutional error could occur during a momentary lapse of attention during the delivery of the instructions, such error was harmless in that Petitioner had two

55

other lawyers present and neither of them objected to the
instructions as actually given despite an invitation to do so.
Crim. Case No. 73 at 3046:20-24.  Nor does any such objection
make any sense because, as noted, this Court followed its
standard practice of having all the lawyers on both sides
preapprove the instructions or preserve their objections on the
record prior to delivering them to the jury.  All that was left
was for the Court to read the instructions to the jury in a
closed courtroom; it was hardly an opportunity for a Perry Mason
moment.  The Court concludes Petitioner has not satisfied
Strickland for this claim.

  4.  Closing Argument

  Finally, Petitioner asserts Kridel's closing argument was
confusing, meandering, incriminatory, and generally
constitutionally ineffective.  The Court declined to hear
testimony on this aspect as the record conclusively demonstrates
Petitioner is not entitled to relief.

  "The right to effective assistance extends to closing
arguments.  Nonetheless, counsel has wide latitude in deciding
how best to represent a client, and deference to counsel's
tactical decisions in his closing presentation is particularly
important because of the broad range of legitimate defense
strategy at that stage."  Yarborough v. Gentry, 540 U.S. 1, 5-6
(2003) (internal citation omitted).  "Judicial review of a

defense attorney's summation is therefore highly deferential . .

. ." Id. at 6.  The Court finds that Petitioner has not shown a

violation of the Strickland standard based on its recollection

of the closing argument and review of the record.

Petitioner faults Kridel's closing statement from the

beginning:

> [B]y opening his summation by telling the jury that
> Ockham's Razor — that is, "the proposition in problem
> solving that often the simplest explanation is the
> correct one" — applied to Evdokimow's case, Kridel
> suggested that the Government's explanation (which, as
> in most cases, was made simple in order to meet the
> standard of proof beyond a reasonable doubt), and not
> the defense's more factually complex one, was correct.

ECF No. 64 at 83.  However, this argument ignores the context of

that invocation:

> [] I would suggest that the government has alleged some
> elaborate, sophisticated, conspiratorial effort to
> defraud the United States Government of taxes. We don't
> think that's the case.  And we beg that you don't,
> either.  We think David is innocent, that he's a victim,
> and not, and should not be, a defendant in this matter.
> We think the government jumped to something.
>
> The simplistic truth, if we go back to some of the
> basics, is that David hired a felon.  Not only is she a
> felon because she pleaded to one in this deal, but she
> had prior felonies, and you saw that up on the screen.
> This is not some wonderful person.  She's a scam artist.

Crim. Case No. 73 at 2943:9-21.  Immediately after telling the

jury that "often the simplest explanation is the correct one,"

Kridel argued to the jury that the simplest explanation was

Sweeton was a scam artist, reminding them that Sweeton had a

criminal record and had lied about her professional qualifications.  Kridel set up the defense's position from the start and did not, as Petitioner claims, invite the jury to accept the Government's explanation.

Petitioner also takes issue with Kridel's "irrelevant tangents and meaningless cultural references to which Kridel dedicated his time," ECF No. 65 at 82, but the closing argument must be assessed as a whole and not as quotations removed from their context.  See Franklin v. Nogan, No. 15-0891, 2018 WL 3325903, at *19 (D.N.J. July 6, 2018) (noting comments had to be "considered within the context of the rest of counsel's summation").  By way of example, Kridel's Dr. Martin Luther King, Jr. quote "Our lives begin to end the day we become silent about things that matter'" was immediately followed by "[y]our verdict matters.  The truth matters. . . . We think that at the fork of the road, hopefully, you'll take the fork that leads to innocence."  Crim. Case No. 73 at 2944:19 to 2945:4.  Kridel quoted Alan Dershowitz in the context of reminding the jury that DaSilva testified under a cooperation agreement with the United States and had a significant incentive to implicate Petitioner. Id. at 2947:3-14.

The quotes may seem irrelevant and meaningless viewed in isolation, but they serve a purpose in context.  Kridel reminded the jury of Sweeton's and DaSilva's dishonesty, emphasizing

DaSilva's evasive performance during cross-examination and motivations for testifying.  He tied this argument back to the beginning of his speech: "Why would [DaSilva] do that?  Because he got a deal.  I think it's pretty simple.  That's why I mentioned Ockham's Razor."  Id. at 2950:16-17.

The Court is also not convinced that Kridel erred in his discussion of Petitioner's returns.  Kridel's reference to the evidence against Petitioner "might remind the jury of facts they otherwise would have forgotten, it might also convince them to put aside facts they would have remembered in any event.  This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion."  Yarborough, 540 U.S. at 9.  The numbers were not in Petitioner's favor; his own expert had opined as such.  Kridel could either ignore that or try and use it to refocus the jury.  See id. ("By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case.").  Acknowledging how bad the numbers looked and arguing that Petitioner was credible when he testified that he never saw the flagrantly false numbers before signing the returns was Kridel's effort to persuade the jury that Petitioner did not have the intent to commit tax fraud.

The Court also finds that Petitioner's assertion that Kridel's errors during his closing argument were compounded by

errors made during the pretrial and trial phases to be insufficient under Strickland.  The Court concluded that Petitioner had not satisfied the Strickland standard in his substantive claims against Kridel; therefore, it follows that he cannot show any errors impacted the closing argument.  The closing argument may not have been the most eloquent speech ever given, but that is not the standard for effective assistance of counsel.  Yarborough, 540 U.S. at 11.  Kridel challenged the credibility of the Government's witnesses, acknowledged the weak points in Petitioner's case, and implored the jury to use their common sense and conclude that Petitioner signed the returns without reading them.  That the jury did not believe Petitioner's defense after considering all the evidence in the case does not mean Kridel was constitutionally inadequate under Strickland.

E.    Cumulative Errors

        Petitioner also raises a claim of cumulative error. "[E]rrors that individually do not warrant habeas relief may do so when combined."  Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007).  The Court considers Petitioner's argument that the generalized disarray of his office and inexperience of Kridel to be part of this analysis as well as the other errors alleged by Petitioner.

Kridel has practiced law for approximately 40 years.  In addition to this Court, he is admitted before the Eastern and Southern Districts of New York, the United States Court of Appeals for the Third Circuit, the United States Court of Appeals for the Second Circuit, the United States Tax Court, the Appellate Division of the Supreme Court of the State of New York for the Third Judicial Department, and the Supreme Court of New Jersey.  Though Kridel's firm, established in 1974, had not handled a federal criminal tax case before a jury, it did have experience with federal criminal tax matters.  In fact, Kridel personally knew the IRS case agent based on prior experience defending clients in IRS investigations.  Tr. Oct. 22, 2020, 110:13-19.  Nor is the Court persuaded that Kridel and the other attorneys working on the matter, including Basil and Heldman, did not keep Petitioner informed of their actions or were otherwise unresponsive to Petitioner's communications.

The Constitution does not require perfect trials, only fair trials.  This was not a perfect trial, but after careful consideration of the trial record, the submissions of the parties, and the evidence presented at the hearings the Court concludes Petitioner received a fair trial and constitutionally adequate representation of counsel.  Overall, Petitioner was not a credible witness at trial, and he was not a credible witness at the evidentiary hearing.  He was evasive and combative, and

his testimony is wholly at odds with the indisputable record. "There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  <u>Strickland</u>, 466 U.S. at 689.

The Court finds that Petitioner failed to establish any ineffective assistance of counsel claims, and even bringing all of his claims together does not make them amount to prejudicial error.  Therefore, the Court will deny the § 2255 motion.

IV.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a § 2255 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This Court will deny a certificate of appealability because jurists of reason would not find it debatable that Petitioner has not made a substantial showing of the denial of a constitutional right.

62

V. CONCLUSION

      For the foregoing reasons, the motion to correct, vacate, or set aside Petitioner's federal conviction will be denied.  No certificate of appealability shall issue.

      An appropriate order will be entered.


Dated: January 25, 2022          s/ Noel L. Hillman
At Camden, New Jersey       NOEL L. HILLMAN, U.S.D.J.